RAMÓN PARÉS COLLAZO, Plaintiff and Appellee, *v.* MARÍA ECHANDI, Defendant and Appellant.

No. 7864. Argued May 29, 1939.—Decided June 21, 1939.

Carlos H. Juliá, for appellant. Herminio Miranda and R. Díaz Co-
llazo, for appellee.

Mr. Justice De Jesús delivered the opinion of the Court.

This is a case in which a husband filed a suit for divorce alleging abandonment. The complaint was filed in the District Court of Arecibo from where it was removed to the District Court of San Juan. The complainant alleged that he had married the defendant in Manatí on July 1, 1920. That they have a child whose name is Héctor and that on the date of the filing of the complaint, to wit, May 5, 1938, he was seventeen years of age. That during the matrimony no property was acquired and that on May 4, 1937, the defendant, without any motive, cause nor legal justification whatsoever, abandoned the complainant and refused to continue their marital life.

The defendant demurred first and later answered the complaint. She admitted the essential averments, except those which referred to the alleged abandonment and as especial defenses she alleged:

That previous to May 4, 1937, she had undergone a delicate surgical operation and left the hospital to be interned in her home under a rigurous medical treatment. That under these circumstances and fearing that she would not recover her health entirely, she went to her mother's home in Manatí in order to properly take care of herself. The defendant then imputes two acts involving excessive cruelty and lack of consideration on the part of the complainant relative to their intimate marital relations to which we do not refer because they are so serious, and as no evidence whatsoever was presented to prove them nor to deny them, we would unjustly prejudice the complainant merely by stating said

acts. The defendant then alleges that to protect her health, given the danger that she was subject to by continuing to live in the marital domicile, she chose to go to her parents' home in Manatí until she was completely cured. That her absence from her home has been purely transitory and that she never had the firm and decided intention of abandoning him and that she was always ready to live with her husband, the complainant. She denies that she has at any time manifested a desire to abandon her home and states that she has never been required by the complainant to return to the same although he knew that her absence was merely accidental and necessary. She then prays that the complaint be dismissed.

The demurrer of lack of cause of action being overruled, the trial was held and as a result, the divorce was decreed. The defendant appealed and alleged four errors as follows:

"*First:* The lower court erred in permitting the attorney Román Díaz Collazo to testify as a witness in regard to propositions relating to the economic position of the defendant and in regard to matters which were not alleged in the complaint nor formed part of the contentions.

"*Second:* The decree rendered in this case is contrary to the law on the matter.

"*Third:* The lower court erred in overruling the demurrer for lack of cause of action.

"*Fourth:* The lower court committed manifest error in the weighing of the evidence in this case."

■ It is true that in considering a motion to dismiss the appeal as frivolous, this Court has expressed itself as follows:

"He assigns four errors." (It refers to the brief for appellant) "The first three are frivolous. The fourth one may be meritorious, by which the trial court is charged with having erred in weighing the evidence, but the record offers no grounds to consider it inasmuch as, although it appears that the appellant asked the stenographer to prepare the record, that the judge ordered its preparation, and that it was prepared and approved by the judge, the truth is that the transcript has not been filed in this Supreme Court.

"For the reasons stated, we are bound to sustain the motion and, therefore, to dismiss the appeal." 54:360.

When this was written, this Court expected that as the transcript of the evidence had been approved by the judge of the lower court, the appellant would immediately take the necessary steps to file the said document, thereby restating her appeal as in fact it was restated, which on its merits did not appear frivolous and this was so held on May 10 of this year. But, in again examining the brief of the appellant in considering the case on its merits, we are of the opinion that the second of the alleged errors does not lack basis. From the averments and the proof it appears as an undenied fact that the defendant left the conjugal domicile on May 4, 1937. From the record it also appears that the complaint was sworn and subscribed to by the complainant before the assistant clerk of the District Court of Arecibo on May 5, 1938. The date of its filing does not appear on the complaint but from the record it appears that on the same date, May 5, 1938, the summons were issued.

As in accordance with Section 88 of the Code of Civil Procedure the summons would not be issued until the complaint has been filed and as it appears from the record that the complaint was sworn to before the assistant-secretary of the District Court of Arecibo on May 5, and that the summons was issued on that same day it appears that the complaint must have been filed necessarily on May 5 at sometime previous to that in which the summons was issued. Assuming that the alleged abandonment began on May 4, 1937, when the defendant left the conjugal domicile and that having been shown conclusively that the complaint was filed on. May 5, 1938, the question would now lie if when the complaint was filed in the District Court of Arecibo, the supposed abandonment of the husband by the wife had extended over a period of one year as is required by Par. 5, Section 96 of the Civil Code (1930 ed.).

In this respect it is convenient to have in mind the provisions of the Political Code in respect to the manner of computing the terms. Section 388 provides:

"Section 388. *The time in which any act provided by law is to be done* is computed *by excluding the first day, and including the last*, unless the last day is a holiday, and then it is also excluded." (Italics supplied.)

Excluding May 4, 1937, the day on which the defendant left her home and beginning to count the period of separation from the next day, that is, the 5th of May, we find that the year of separation was completed on May 4, 1938, but as this last day must be included in the computation of the term according to the provisions of Section 388 of the Political Code, *supra,* the term of the year of separation was concluded at the end of said day, May 4, 1938 and therefore the complaint filed on the 5th of May was in time or, that is, after the year was completed. *Nickerson* v. *Pres. & Fellows of Harvard College* (Mass., Nov. 7, 1937) 11 N. E. (2d) 444; *Pacific Mutual Life Ins. Co.* v. *Alsop,* 134 N. E. 290; *Earle Improvement Co.* v. *Chatfield,* 99 S. W. 84; *Meridian Life Ins. Co.* v. *Milam,* 188 S. W. 879.

■■ Until now we have referred to the period of expiration. For the purposes of alleging abandonment as a cause for a divorce, it is not at the time when the expiration begins that is counted in computing the year of abandonment, but from the moment of the nolition, or that is, that moment in which the defendant spouse expresses his or her firm and decided intention of abandoning his or her partner.

From the evidence of the complainant it appears that the defendant left the conjugal domicile as a result of a serious squabble with her husband, one of the witnesses stating that she was screaming and very nervous. No evidence exists that at that moment she expressed an intent of abandoning her husband. The complainant himself testified that in view of her insistence of going to her parents' home and as he

could not disuade her nor accompany her personally, he ordered his two brothers, Víctor and Carlos Parés, to accompany her in a car which he hired and paid for. Any manifestation which she might have made in the heat of the squabble with her husband in regard to the intent of abandoning him could not be considered as the firm and deliberate intent of abandoning forever the marital *nexus*. Her state of mind is shown by the fact that even though she was ill she insisted in leaving immediately for Manatí, taking the public car and disregarding the late hour. It is reasonably said in 17 American Jurisprudence 194, that the statements made by the wife in the moment of leaving her husband generally are not interpreted as showing her intention to abandon her husband within the meaning that the word abandonment has a cause for divorce.

This doctrine is not new in this jurisdiction. It was stated in the case of *Girot* v. *Crispín*, 23 P.R.R. 764, 766:

"That the defendant has been separated from the plaintiff for more than one year is shown, but not how the separation began, and although the plaintiff made efforts to have his wife return to live with him, it does (not) appear when he did so, *and this is an indispensable requisite in order to determine that the wife has been separated from her husband for more than one year. Mere separation with the consent or tolerance of the other cannot be considered abandonment. An indispensable requisite to abandonment is the refusal of one spouse to live with the othe rand the period of abandonment begins to run from the time when such is manifested."* (Italics supplied.)

In an extensive monography appearing in 138 Am. State Rep. 146, 148, as to what constitute "abandonment" as a cause of divorce, the same doctrine is stated in the following terms:

"Most of the statutes provide what period must intervene before one spouse can institute suit for divorce on the ground of desertion by the other. The decisions uniformly hold that the desertion commences when the intent to desert is, either by some action or declaration, made manifest." (Cases are cited from state reports.)

Let us see in this case when the defendant manifested, according to the proof of the complainant, her firm and deliberate intent to abandon her husband. The defendant denies emphatically that she has ever had such an intent. And it is for this reason that we limit ourselves to the complainant's evidence accepting it as true for the purposes of the argument.

From the testimony of the complainant himself, the following appears:

"Q. Are you at present living with your wife?

"A. No, sir.

"Q. Since when?

"A. We have been separated since May 4, 1937.

"Q. What was the motive of that separation?

"A. Well, on that date we had a squabble and in spite of my insistence and advice and of my family, she insisted in going to her home.

"Q. At that time where did you live?

"A. I lived in the Condado, in Wilson Street.

"Q. Wilson Avenue?

"A. In the house of District Attorney Massari.

"Q. Once she left your home as you explained, did you take any steps to make her return there?

"A. Yes, some days later I sent you to her.

"Q. The attorney who is making the questions?

"A. The attorney who is asking me the questions in his character as one of my family.

"Q. On any other occasion?

"A. Afterwards I sent my two brothers.

"Q. And what was the result of these measures?

"A. Absolutely negative, she refused.

"Q. And did you personally had any chance to take any measures?

"A. A few months ago, in answer to a telephone call from her, I went to her at a house where she was living in Morell Campos Street, in Santurce, and I thought we were going to talk in a friendly manner to fix up the situation but she only talked to me of divorce and of economic conditions.

"Q. She talked of divorce based on economic conditions?

"A. Yes, sir.

"Q. What was the result of your efforts, did you bet her to return to your house?

"A. Absolutely not. (Transcript of the Evidence, pages 2–3.).

And from the cross-examination the following appears:

"Q. On what date was it that Mrs. Echandi left your house in the month of May, 1937? What day of the month was it, do you remember?

"A. I remember because it was brought to my attention by the papers in this case. The 4th of May.

"Q. The same date that is stated in the record of this case?

"A. Exactly.

"Q. Do you remember where your wife went when she left your house on that ocassion?

"A. Well, I sent her to her mother's house accompanied by two of my brothers.

"Q. So that you sent her?

"A. I made my brothers accompany her when she insisted on going.

"Q. You sent her to her parent's house?

"A. Not that I sent her, I made two of my brothers accompany her to her mother's house, since it was her absolute determination to go.

"Q. To her mother's house, where?

"A. In Manatí.

"Q. And you two brothers took her to her mother's house in Manatí?

"A. To accompany her.

"Q. In what automobile?

"A. They went in a car for hire as I have no chauffeur.

"Q. That car for hire, do you remember who hired it?

"A. We did, one of my brothers.

"Q. In your name?

"A. In my name.

"Q. Did you pay for it?

"Yes.

"

"Q. Who were the people to took the measures of which you spoke a while ago?

"A. My counsin, Attorney Díaz Collazo, and my two brothers, Víctor and Carlos.

"Q. Do you remember more or less on what date it was that those brothers of yours carried the measures of which you spoke to us.

"A. A short time after she left.

"Q. About how long afterwards?

"A. I don't remember exactly, in the next few weeks; immediately afterwards.

"Q. Were these brothers the same who accompanied her to Manatí?

"A. The ones who accompanied her to Manatí.

"Q. And those brothers who accompanied her to Manatí were the same that you now mention as having taken measures in your name?

"A. Yes, sir.

"Q. Here or in Manatí?

"A. In Manatí." (Transcript of the Evidence, pages 4-6).

It does not appear from the evidence of the complainant that on the 4th of May, 1937, the date on which the defendant went to Manatí, she made any manifestation of her firm intention of no longer living with her husband.

From the testimony of Víctor Parés, who ordered by his brother, the complainant, accompanied the defendant to Manatí, the following is all that appears in regard to the defendant's leave taking:

"Q. On or about the 4th of May of last year, you remember having had occasion to go to Manatí?

"A. Yes, sir, at night.

"Q. For what purpose?

"A. In order to take my sister-in-law to her home, as she wished to leave.

"Q. Why do you say that she wished to leave?

"A. Well, because I remember that I was in the parlor when I heard some screams upstairs and I went up and found her having an attack of nerves and then Mon, my brother, argued with her not to do that and she wanted to go out into the street and we reasoned with her not to go. It appears that there had been an squabble between them and she decided that she was going to Manatí.

"Q. Did she leave definitely?

"A. She left definitely and then my brother sent for a car and my other brother and I accompanied her.

"Q. Which brother?

"A. Carlos.

"Q. On the road did you have an opportunity of talking?

"A. We argued with her and told her not to be silly, but nevertheless she insisted.

"Q. After you accompanied this lady to Manatí as you have explained, did you see her on any other occasion?

"A. Yes, of course.

"Q. How much later?

"A. About ten or twelve days.

"Q. After that date?

"A. Yes, sir.

"Q. Where?

"A. In her house.

"Q. In what house?

"A. In the house over there, her mother's house.

"Q. But outside of San Juan?

"A. Outside of San Juan in Manatí.

"Q. Why did you go?

"A. I went because my brother told me to go with her and try to convince her to return.

"Q. Did you see her?

"A. Yes, sir.

"Q. Did you speak to her?

"A. Personally.

"Q. Did you tell her of the purpose of your visit?

"A. Yes, sir.

"Q. And what was the result of this measure?

"A. The result was that she said that she did not wish to come to the house any more and that she only wanted to get a divorce and settle her financial condition; that she wanted to live alone.

"Q. Did you tell this to your brother?

"A. Yes, sir." (Transcript of the Evidence, pages 10–11.)

In regard to the testimony of the other witness Carlos Parés, the parties stipulated that it would be the same as that of his brother Víctor in regard to what had occurred on May 4, 1937, and in regard to the trip which they took to Manatí.

So that from the evidence of the complainant himself, accepting it as true for the purposes of the argument, it

appears that the nolition of the defendant was not manifested until several weeks after the 4th of May, 1937, when she was visited by the Attorney Díaz Collazo and as it is alleged by the brothers of the complainant on two distinct occasions. As the nolition in this case, according to the evidence of the complainant himself was manifested several weeks after May 4, it is evident that, accepting that evidence as true, the complaint should have been filed several weeks after May 5, so that the term of one year of abandonment required by law should have been completed when the complaint was filed.

The second error which we have just discussed would be sufficient to reverse the judgment, but the appellant has alleged that the lower court committed manifest error in weighing the evidence. We will therefore discuss the merits of the case.

The complainant himself was the first witness to take the stand. His testimony is relatively brief. On direct examination he testified that on May 4, 1937, his wife and he had ''a quarrel, a squabble,'' and that disregarding his advice to her not to leave the house, she insisted in leaving and going to her mother's house in Manatí. That as he could not dissuade her, he ordered one of his brothers, Víctor Parés, to get an automobile for hire and that together with his brother Carlos Parés, he accompanied her to Manatí. That a short time afterwards he asked his cousin, attorney Díaz Collazo, to visit the defendant and to persuade her to return to her home but that the measures taken by said attorney were unsuccessful due to the fact that she insisted upon obtaining a divorce. That he also sent his two brothers and that they were also unsuccessful. Finally, that a few months before the trial and in answer to a telephone call from the defendant, he had an interview with her in Santurce, in Morell Campos Street, but that at that time she did not speak of a reconciliation but of divorce and of the manner of straightening out the economic situation. On cross-examination, the complainant testified that on May 4, 1937, the

defendant was convalescent after a surgical operation which she had undergone. That the complainant's mother was in San Juan assisting her. That although he frequently went to Manatí to see his son, he never went to her and although, in answer to questions of the other attorney who testified that he found out about her health from his child, he, nevertheless, testified that he did not know that she went to a hospital and that he thought that she continued in good health.

As we will see later on from the testimony of the defendant, she told her son to write to his father too, as about his health and to ask him to come and see her, that she wanted to see him, etc. In regard to this, the attorney for the defendant on cross-examining the complainant, asked him the following questions:

"Q. When your son and his mother were in Manatí, did your son write to you?

"A. Well, every week I . . . . The boy came to see me and I went to see him.

"Q. On those trips to Manatí, did you go to see your wife in the house where she was ill?

"A. I did not know that she was ill.

"Q. But you say that you knew that she was convalescent from a surgical operation.

"A. That she was getting better, that she was improving.

"Q. She was convalescent?

"A. Yes, sir.

"Q. You never found out?

"A. In the condition that she was . . .

"Q. Didn't you ask about her?

"A. I asked my son.

"Q. Didn't you visit her?

"A. No, sir.

"Q. Your son gave you no messages that she sent you?

"A. No, merely matters of money.

"Q. He did not tell you that his mother wanted you to go and get her?

"A. To come to San Juan, no."

Víctor Parés, the brother of the complainant, was the second witness to take the stand. After stating what we already know about the happenings of May 4, 1937, he testified in his direct-examination that ten or twelve days after having accompanied defendant to Manatí, he was sent by his brother, the complainant, to her house to convince her to return to the conjugal domicile. That the defendant answered that she did not wish to return to San Juan, that she only wanted a divorce and to settle her financial situation. On cross-examination he was asked the following questions:

"Q. Then it was in the same month of May? (Referring to the visit to the defendant.)

"A. Yes, sir, more or less in the month of May.

"Q. Was she alone or accompanied?

"A. I do not remember, I think she was alone.

"Q. You think she was alone?

"A. I cannot remember exactly.

"Q. At what time more or less was your visit?

"A. In the afternoon.

"Q. After lunch?

"A. In the afternoon, after lunch.

"Q. But after dinner or before?

"A. Before dinner.

"Q. You don't remember the specific day, do you?

"A. The specific day, no.

" . . . . . . . . .

"Q. That day that you went there, twelve or fourteen days after having taken her, did your brother go also?

"A. No, I went alone.

The third witness to testify was the other brother of the complainant, Carlos Parés. In the direct-examination he was asked the following:

"Q. Do you remember having visited the house of the defendant in Manatí after May 4 of last year?

"A. Yes, sir.

"Q. Do you remember the date.

"A. Exactly I don't remember.

"Q. But approximately, one month, or a month and a half, two months, six weeks, five?

"A. About two months had elapsed or may be a month and a half."

On cross-examination he was asked the following questions in regard to his visit to the defendant:

"Q. You say that you went to visit Mrs. Parés' house about a month and a half or two months after May 4?

"A. Yes, sir.

"Q. To be more exact, do you remember whether it was in the month of June or July that you went there?

"A. I believe that it was in the month of May, June or July, it must be around there, a term of two months.

"Q. But you do not remember whether it was in June or July?

"A. Precisely.

"Q. Was it a holiday or a working day?

"A. I do not remember.

"Q. You remember what day of the week it was that you went there?

"A. No, sir.

"Q. Where you working at that time?

"A. No, sir.

"Q. What did you do then?

"A. I was on vacation.

"Q. You were studying at the university?

"A. Yes, sir.

" . . . . . . . .

"Q. Was your visit during the day or the night?

"A. During the day.

"Q. At what time?

"A. I cannot state the exact time.

"Q. In the morning or in the afternoon?

"A. I do not remember, I do not have it clear in my mind.

"Q. Did you talk with Mrs. Parés?

"A. Yes, sir.

"Q. Were there other people present?

"A. That may have been, although I don't remember clearly.

"Q. You do not remember if it was her sister, Miss Parés, who was there?

"A. It might have been but I don't remember."

It seems strange that these two witnesses, who even though they are testifying approximately one year after their visit which had so much importance due to the delicate mission which they undertook, to not remember any detail in regard to the circumstances attending the visit, and that is more noticeable from the fact that they were related to the people living in the house where the defendant was, a circumstance which would help them to remember any person who might have been there, as it is probable that it would have been a relative of the defendant and well known to these witnesses.

The last witness of the complainant was his attorney, Román Díaz Collazo, who testified that on two different occasions he spoke to Mrs. Parés following instructions of the complainant and that on both said occasions she manifested her desire of obtaining a divorce and of fixing what she called "her economic situation". The witness Díaz Collazo was not cross-examined.

Defendant's mother and her sister testified for her and they, as well as the defendant, emphatically denied that Víctor and Carlos Parés had visited the defendant after May 4, although they admit that Díaz Collazo visited her but the defendant states that he did not go to her to speak of a reconciliation but of a divorce.

They also testified that the defendant was in bed the greater part of the time and that she only left the bed to sun herself near a window. That she manifested a desire to return to her husband and that she so stated to her son, that she wished to return to her house as soon as she was better. The sister of the defendant testified that she and her mother did not wish the defendant to return to San Juan until she was completely well. That the defendant stayed in Manatí until she again became ill and had to go to the hospital for a second time.

The defendant testified in the following manner:

"Q. Did you leave your house on May 4 of last year?

"A. Yes, sir.

"Q. Kindly tell the court the manner of your leave on that day.

"A. If left on the 4th of May with my husband's consent for my home in Manatí because I had recently undergone an abdominal operation and I had to convalesce in my house. His mother was assisting me while I was there but his mother is elderly and she suffers from filaria. The house is a two story house and she had to go up and downstairs very much and I told my husband it was more convenient for me to go to my mother's house in Manatí, where there were other persons of my family who could also assist me because I caused his mother a great deal of work and that so as not to bother her I did not do things which were necessary and because it seems that the effort I made in getting up hurt me and I had a setback and I indicated to my husband that it was more convenient for me to go to my mother's house and there to convalesce and that when I was well I would come back to my house and take care of him and my child.

"Q. So that on the 4th of May you went to your mother's house in Manatí with the consent of your husband?

"A. Yes, sir.

"Q. Who took you to Manatí?

"A. His brothers. Víctor and Carlos.

"Q. Your husband did not go to Manatí?

"A. No, because during those days he was very busy, and he told me that he could not take me, that he was going to send me with his brothers and in the afternoon his brothers took me.

"Q. How long were you in your mother's house in Manatí?

"A. I was all the time until I was sick again and I had to come to the Díaz García Clinic to undergo a treatment.

" . . . . . . . . . .

"Q. During the time you were in Manatí, did your husband visit you?

"A. He did not come again.

"Q. Did you send him any message; what did you do?

"A. I sent him word and I sent my son. I took all the measures possible for him to come and see me, because I wanted him to come and see me and my son also did so. He used to write to his father about my health and so that I would know about him also, because as I love him I was interested in knowing of the state of

his health, and as I could not write, I made my son do so, and he did every thing that I told him because when my son was in my mother's house, he was with his grandmother in Manatí, in my husband's house and she used to come to see me every day.

"Q. When you came to San Juan, did you do anything to get your husband to go and see you and take you home?

"A. I called him to go to the clinic and get me and he did not answer.

"Q. Can you tell the court specifically if on the 4th of May when you left for Manatí, you had a decided intention of abandoning your home, your husband and your child forever?

"A. No, that was not my intention, my intention was to get well to be able to take care of them.

"Q. Did you tell your husband that before you left?

"A. Yes, I told him that.

"Q. And your husband agreed that that be done?

"A. Yes, sir, and then he sent me to Manatí.

"Q. The attorney Díaz Collazo, attorney for Parés, has manifested here in court that he had certain conversation with you, the attorney Susoni and another man in your house in Manatí, were there two interviews?

"A. Yes, sir.

"Q. Will you kindly tell the court if on either of those occasions you told some one or made any public manifestations that you had the decided and firm intention of abandoning your husband?

"A. I never made any such manifestations. I always said that I wished to return to my home and a few days after I was home ill, the attorney Díaz Collazo came to see me and I asked them for my husband, why he did not come to see me, that I needed to see him, that I wanted to see him, that I wanted to see him at my side, that I loved him, that he came to Manatí and did not come to see me and that that made me suffer a great deal, the fact that he did not come to see me; and as I could not go out, I told my son to write to him and ask about his health, about the health of my husband.

"Q. And in the conference you attended in the office of attorney Susoni, did you at any time make any manifestations in the sense that you wished to break with your husband and that your attitude of abandoning him was definite?

"A. They made me propositions for a divorce but they were propositions made by them.

"Q. Not made by you?

"A. No, sir, never.

"Q. Have you ever expressed the idea of divorcing your husband?

"A. Never, never.

"Q. Have you had at any time expressed your intention of abandoning him definitely?

"A. No, sir.

"Q. Are you ready and willing to return and live with your husband, now, immediately, at whatever moment he wishes?

"A. Yes, sir.

The defendant was not cross-examined either.

In the case of *Fernández* v. *Hernández*, 8 P.R.R. 229, 234 this Court, through its Associate Justice Figueras, said the following:

"The husband, Serapio Fernández, took an appeal, and both he and his wife, entered an appearance before this Supreme Court through their respective counsel, Díaz and Texidor, and Eduardo Acuña, the former presenting his brief in which he minutely analyzes the evidence introduced, which he' alleges to be favorable to the divorce, and he asserts that the statement of the defendant wife cannot be given the weight which the trial judge gives thereto, because it is unsupported and is contradicted by the testimony of the witnesses.

"On the other hand, the *fiscal* and counsel for the respondent maintain the justice of the judgment appealed from, and at the hearing they set forth orally the reasons supporting their contention.

"The trial judge is right. A spouse who resorts to so important a remedy as that of divorce, sundering the marriage bond and destroying a home born of mutual love, in which there now are innocent children, should be free from all fault, a real victim who had exhausted all triendly means to arrest the evil at its inception.

"But when this is not the case, one who sits in judgment should meditate with a serene mind and weigh at their true worth the causes for the rupture in question."

To the same effect and in a monography hereinbefore cited, in American State Reports, page 155, the following is said:

"*Good Faith in Seeking Reconciliation.*—Where the plaintiff suing for a divorce on the ground of desertion is under the duty of

seeking a reconciliation, because he or she is responsible, solely or in conjunction with the defendant, for the separation or desertion, he si required to show not only an ineffectual attempt at reconciliation, but also that he made the attempt in good faith and before the statutory period of desertion had elapsed.'' (Authorities are cited.)

In this case we do not see on the part of the complainant a sincere or *bona fide* disposition to solicit a reconciliation with his wife. Accepting his version as to the cause of his wife's leave of the home, it appears that that squabble or difference, as he calls it, took place a short time after she had come back from the hospital where she had undergone surgical intervention and while she was still ill. We will not discuss the motives of the quarrel. It is sufficient that she was sick and whether she was right or wrong she should have been treated with consideration by her husband. Nevertheless, she leaves, he frequently goes to Manatí and does not even bother to ask as to the state of her health. Although he says that his seventeen years old son told him that his wife was better, nevertheless, from his own testimony it appears that he was ignorant of the fact that she had had to return to a clinic in Santurce because she had had a set-back, testifying that he found out that she was in the clinic when the bill was brought to him.

Under these conditions, is not a wife justified in rejecting the propositions made to her by her husband to return to her home, through other people? Was she not justified in thinking that her husband, who sees her leaving her home sick, who goes frequently to Manatí and does not bother to visit her and that shows disregard for her health, was she not justified in thinking, we repeat, that when the complainant required her through other people to reassume her conjugal life, he does not do it sincerely and motivated by the love that she should expect from the father of her son to whom she has been joined in matrimony for eighteen years? That the defendant would have been justified in so

thinking is shown by the evident impatient manner of the complainant in filing his complaint for divorce a mere few hours after the term of a year of separation was completed.

The case of *Más* v. *Muñoz*, 35 P.R.R. 799, presents an analogous situation to the one in this case. The opinion of the Court, written by Chief Justice Mr. Del Toro, is very short and we copy:

"In October, 1922, José Más Guardiola brought an action for divorce against his wife, averring that she had deserted him more than a year before. The defendant answered that it was her husband who had deserted her; that she had no intention to desert him, and that she was willing to live with the plaintiff whenever so requested by him.

"[1] At the trial the evidence of the plaintiff consisted of his testimony and that of Carlos Matos and José A. Florido. The defendant's evidence consisted of her own testimony and that of Ildefonso Estella and Felipe Zavala. We have analyzed the evidence and in some parts it is contradictory. Assuming that the conflict was adjusted by the court and that this court should accept the view most favorable to the plaintiff, even then we are of the opinion that that abandonment referred to by the law and the jurisprudence as ground for divorce has not been shown.

"[2] The fact of physical separation is not sufficient; nor that of mere quarrels. It is necessary to show a firm and deliberate intention, followed by action, not to live together, but actually to break the matrimonial bond. And in this case the wife did not so act. She testified at the trial 'that it was never her intention to separate herself definitely from her husband and never had thought of it, for she loved him and he is the father of her children, he being the only man whom she has loved.'

"This is a case of a young married couple with many children and without wealth. The matrimonial bond should not and will not be broken, for only by uniting their physical and spiritual forces can they fulfill their destiny.

"The judgment appealed from should be reversed and the complaint dismissed."

In the case of *Arce* v. *Lebis*, 50 P.R.R. 857, 863, where a like question arose, although not identical to the present case,

in reversing the judgment decreeing the divorce, this Court, through its Associate Justice Mr. Travieso, said:

"[4, 5] We do not find in the record sufficient evidence of a firm and decided determination on the part of the defendant to live separated from her husband. On the contrary she testified as follows in answer to questions of his attorney:

" 'Q. Tell me, are you willing and have you always been willing to live with your husband and to continue as you were before he left?

" ' . . . . . . . . .

" 'A. I always tried to avoid any quarrel between us and stood everything and saw many things which have been very sad and painful for me which I will not name because I am ashamed, and in spite of everything I tried to avoid everything in order to maintain peace and union in the home because I always had faith that that would all pass and that he would be as he was before.

" 'Q. You are now willing to live with your husband?

" 'A. I always have been and am willing to live with my husband because I have always loved him.

" 'Q. And you still love him?

" 'A. I love him and he is the father of my daughter and if he had come I would have accepted him at any time.'

"The record does not show that the plaintiff-husband has at any time expressed the same sentiments of love or desire for a reconciliation with his wife."

In the opinion rendered by the lower court in referring to the manifestations of the defendant in regard to her wishes of reassuming the marital life with her husband, states the following:

"On the manifestations made at the end of her testimony that she is ready to reassume her marital life when her husband wishes, it does not appear to be the frank and since expression of the abandoned wife who wishes to re-unite herself to her husband, but a mere offer without a true purpose of carrying it out, shown by her previous attitude."

We have examined the transcript of the evidence and in truth we do not find that this statement of the judge of the lower court is sufficiently justified by the evidence.

In our opinion there also exists a manifest error in the weighing of the evidence.

For the foregoing reasons, the judgment appealed from in this case should be reversed and another should be rendered dismissing the complaint and awarding costs to the defendant, including the amount of $200 which is fixed as attorney's fees.